Cite as 2024 Ark. App. 86

# ARKANSAS COURT OF APPEALS
DIVISION I
No. E-22-627

| | | |
|---|---|---|
| | | Opinion Delivered February 7, 2024 |
| STEPHANIE STARK | | APPEAL FROM THE ARKANSAS |
| | APPELLANT | BOARD OF REVIEW |
| V. | | [NO. 2022-BR-00385] |
| DIRECTOR, DIVISION OF WORKFORCE SERVICES | | AFFIRMED |
| | APPELLEE | |

**WENDY SCHOLTENS WOOD, Judge**

Stephanie Stark appeals the decision of the Arkansas Board of Review (Board) denying her unemployment benefits upon finding that she was discharged for misconduct in connection with her work. On appeal, Stark contends that the Board's decision is not supported by substantial evidence. Because substantial evidence supports the Board's finding of misconduct, we affirm.

Stark began working for the Piggott Community Hospital as a housekeeper on February 23, 2021. She was discharged on June 22, 2021, and her claim for unemployment benefits was denied by the Division of Workforce Services upon finding that she was discharged for misconduct in connection with her work—specifically, insubordination. Stark appealed to the Appeal Tribunal (Tribunal), which affirmed the denial of benefits. Stark

appealed the Tribunal's decision to the Board, which also affirmed the denial of benefits based on misconduct.[1]

At the Tribunal hearing, Tracy Spinks, the housekeeping supervisor, represented the employer. She testified that Stark's employment ended on June 22, 2021, when Stark refused to attend a disciplinary meeting. Spinks explained that she was trying to issue a written reprimand to Stark and that Margrette Crawford was in the office with her. Spinks said that Stark refused to come into the office and requested Tonya Jordan, the human-resources manager, to participate. Spinks testified that Jordan was called and reported immediately, but Stark stated that she felt uncomfortable participating in the meeting with the three participants and left for a short period of time. Spinks stated that when Stark returned, she informed Jordan that she wanted a neutral party to be present. According to Spinks, Jordan informed Stark that she was a neutral party and that no one else would be called to participate. Spinks added that Jordan told Stark to come into the office for the meeting and listen to what Spinks had to say, but Stark continued to refuse, at which point Jordan told Stark that if she did not attend the meeting, she no longer had a job there.

---

[1]In her appeal to the Board, Stark requested and was granted an additional hearing to address evidentiary objections raised at the Tribunal hearing, including the denial of her request to subpoena witnesses and the Tribunal's reliance on hearsay evidence contained in written documents without Stark having the opportunity to cross-examine the declarants. The Board agreed with Stark and concluded that "considering this [documentary] evidence as substantive would violate the claimant's due process rights" and that because "the hearsay testimony in question concerned events outside of the relevant incidents which led to [Stark's] discharge, the Board will not be considering the testimony regardless of whether it is hearsay." Stark makes no argument that the Board improperly considered excluded evidence, and our review is limited to the evidence considered by the Board.

Spinks testified that Stark was fired for insubordination because she did not attend the meeting and sign a reprimand. Spinks stated that the reprimand related to a text message she sent Stark about a telemetry machine, tagged as having been cleaned by Stark, that was dirty and needed to be cleaned. During the text exchange, Stark denied that she left the machine dirty and told Spinks to "watch her tone." Spinks also said that Stark repeatedly demanded to know who told Spinks that the machine was dirty but did comply with the request to clean the machine.

Margrette Crawford, an administrative assistant, testified that she was inside Spinks's office when Stark was called for the disciplinary meeting. Crawford stated that Stark was in the hallway and was asked several times to come inside. She confirmed that Stark requested Jordan; that Stark still refused to come inside after Jordan had arrived; that Stark asked for a neutral party; that Jordan informed Stark that she, as the human-resources manager, was a neutral party; and that Jordan discharged Stark when she continued to refuse to come inside the office.

Stark testified that on her last day of work, she was told that Spinks needed to speak with her. Stark said that when she got to the office, she told Spinks and Crawford that she was not comfortable meeting with them and wanted a neutral party. Stark denied asking for Jordan. Stark testified that Jordan was called to the office, but she did not feel like Jordan was a neutral party because Stark had reported Spinks to Jordan for disclosing the results of Stark's pre-employment drug test to coworkers and felt like Jordan had not acted on the report. Stark stated that Spinks's attitude toward her changed after she made the report,

explaining that Spinks would critique her work daily, give her extra work, and not schedule her correctly. Stark denied that Jordan told her that she would be fired if she did not attend the meeting.

In regard to the text exchange involving the telemetry machine, Stark said that she thought Spinks was "yelling" at her because Spinks used exclamation points after she texted Stark that the machine needed to be cleaned. Stark said that she did not want to be in trouble for the telemetry machine being cleaned incorrectly, explaining that the nurse who used it must have forgotten to take the tag off. Stark also testified that her discharge was not handled according to company policy because she was not suspended prior to being discharged until a full investigation was conducted, and a review of a dismissal recommendation was not conducted prior to her discharge.

When questioned by the hearing officer, Stark admitted she had sent the text message telling Spinks to watch her tone. Stark said she did not believe that requesting a neutral party was "too much to ask for." She claimed that the meeting was not the issue, but she did not trust the people in the meeting. Stark said that she was unaware of a policy that allowed her to have a neutral party but that no one ever said it was not allowed. Stark denied that anyone told her that Jordan was the neutral party and no one else would be allowed. Stark said she wanted a neutral party who could "vouch" for what happened in the meeting.

Hunter Samples, a housekeeper and Stark's coworker, testified that she learned of Stark's failed drug test from Spinks. Samples said that Spinks treated Stark worse after she reported Spinks to Jordan for disclosing the test results, but Samples did not believe that

4

Stark was given extra work. Samples said that Stark was nervous about the disciplinary meeting and asked Samples to stand in the hallway. Samples testified that Stark asked for a neutral party but did not hear Stark request Jordan. Samples said that she was nervous because she was not supposed to be there and left when Jordan arrived.

In addition to the testimony, the documentary evidence introduced at the hearing included Stark's June 25 "Discharge General-Claimant Statement." In her explanation of the final incident leading to discharge, Stark wrote:

> I was told to attend a meeting with my supervisor [Spinks] and her assistant [Crawford] I made them aware that I was uncomfortable and wanted a third party. My supervisor chose Tanya [Jordan] and I let them know I was not comfortable with her and I asked for someone else and was fired on the spot.

She also explained in her written statement why she was no longer working:

> I have had some very serious issues with my supervisor [Spinks] involving violations of policy and there was an ongoing investigation prior to this meeting. I went to [Jordan]/HR with the issues and I felt like she was not neutral and did not do her job as HR because of her friendship between her and my supervisor. I was told I had a meeting with my supervisor and her assistant [Crawford] and I told them I was uncomfortable being in a room with them that I would like a third party. My supervisor chose to go get [Jordan]. I told them again I was uncomfortable with [Jordan] and would like a third party. [Jordan] then stated that if I don't want to have the meeting I could leave then I stated again that I don't mind to have the meeting I just want a third party in the room someone other than [Jordan] that's when I was told I was no longer employed there and I needed to leave.

The Board found that the evidence demonstrated that Stark was given an ultimatum to either attend the meeting or be discharged. Recognizing that the evidence was conflicting, the Board specifically found Stark's evidence to be noncredible and the employer's evidence to be more credible. Further, the Board found that Stark did not believe she had a right to

a neutral party given her account that she was not told that she could not have one, and that even if she initially believed she could have a neutral party, Stark would not have continued to believe she had that right after being told that no one else would be called and that she would be discharged if she did not attend the meeting. The Board also noted that Stark did not suggest there was a policy to support her belief that she was entitled to have a neutral party present and that her belief was based only on the fact that she was not told she could not have one. In finding that Stark was discharged for misconduct in connection with her work on account of insubordination, the Board stated that the employer has an interest in its employees attending disciplinary meetings, the employer had the right to expect that Stark would comply with a supervisor's or human-resources manager's reasonable instructions, Stark refused to attend the meeting despite being warned, and Stark was insubordinate when she refused to comply with reasonable instructions. Finally, in response to Stark's argument that her discharge was retaliatory in nature, the Board found that there was insufficient evidence that her employer was motivated by anything other than Stark's behavior the day of her discharge. This appeal followed.

The standard of review is well settled. We review the Board's findings in the light most favorable to the prevailing party and affirm if the Board's decision is supported by substantial evidence. *Follett v. Dir.*, 2017 Ark. App. 505, at 2, 530 S.W.3d 884, 885. Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* at 2, 530 S.W.3d 885–86. Even when there is evidence upon which the Board might have reached a different decision, the scope of our review is

6

limited to a determination of whether the Board reasonably could have reached the decision it did based on the evidence before it. *Id.* at 2, 530 S.W.3d 886. The credibility of witnesses and the weight to be accorded their testimony are matters to be resolved by the Board. *Bright v. Dir.*, 2021 Ark. App. 217, at 2, 625 S.W.3d 720, 722.

A claimant is disqualified from receiving unemployment benefits if the claimant is discharged from his or her last work for misconduct in connection with the work. Ark. Code Ann. § 11-10-514(a) (Supp. 2023). Misconduct, for purposes of unemployment compensation, involves disregard of the employer's interest, violation of the employer's rules, disregard of the standards of behavior the employer has a right to expect of its employees, and disregard of the employee's duties and obligations to the employer. *Follett*, 2017 Ark. App. 505, at 2–3, 530 S.W.3d at 886.

There is an element of intent associated with a determination of misconduct. *Id.* at 3, 530 S.W.3d at 886. Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion do not constitute misconduct. *Id.* at 3, 530 S.W.3d at 886. There must be an intentional or deliberate violation, a willful or wanton disregard, or carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design. *Id.* at 3, 530 S.W.3d at 886. It is the employer's burden to establish misconduct by a preponderance of the evidence. *Id.* at 3, 530 S.W.3d at 886. Whether an employee's behavior is misconduct that justifies the denial of unemployment

7

benefits is a question of fact for the Board to decide. *Hopkins v. Dir.*, 2019 Ark. App. 84, at 3, 571 S.W.3d 524, 527.

For her sole point on appeal, Stark contends that the Board lacked substantial evidence to conclude that she committed misconduct in connection with her work. Stark's first three arguments focus on the intent element of the Board's misconduct finding. Specifically, Stark contends that "the Board lacked substantial evidence to support its finding that [she] was issued an ultimatum and, therefore, was not credible where the employer's representative recanted the only admissible evidence of an ultimatum"; "[a]bsent the fictive finding of an ultimatum, the Board lacked substantial evidence to conclude that the employer met its burden to prove that [she] intended to disregard her employer's interests because she held an uncontested subjective belief that she had a right to a neutral, third party witness"; and "[b]ecause the hospital did not follow its termination policy and can point to no policy violated by [her] request for a third party, the Board lacked substantial evidence to conclude that [she] willfully disregarded the hospital's interests, and therefore committed misconduct."

We find no merit to Stark's arguments and hold that substantial evidence supports the Board's finding of misconduct. Stark was called to Spinks's office to attend a disciplinary meeting. The evidence is undisputed that she refused to attend the meeting. There was conflicting evidence about whether Stark requested that Jordan attend the meeting, whether Jordan informed Stark that she was a neutral party, whether anyone else would be called to the meeting, and whether Stark was told that she would be fired if she did not attend the

meeting. However, the Board resolved these matters in favor of the employer, finding that Stark was not credible and the employer was more credible. Substantial evidence supports these findings.

Spinks testified that Stark was told that Jordan was the neutral party and no other party would be called and that Stark was told that she would be fired if she did not attend the meeting. Crawford also testified that Stark was told that Jordan was the neutral party. And while Stark denied being given an ultimatum, in her written statement she admitted that Jordan told her that "if I don't want to have the meeting I could leave." The Board acknowledged that Stark's wording was "somewhat different than what the employer's witnesses asserted" but that Stark's written statement was inconsistent with her hearing testimony.

Inconsistencies in the testimony, the credibility of witnesses, and the drawing of inferences from the testimony are matters for the Board, and not this court. *Ramirez v. Dir.*, 2013 Ark. App. 453, at 6. Here, there was evidence presented that Stark refused to attend the meeting after she was told no one else would else would be attending and that she would be discharged if she did not attend. This evidence was sufficient for reasonable minds to conclude that Stark's conduct exhibited "an intentional or deliberate violation, a willful or wanton disregard, or carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design."

Stark further challenges the intent element of the misconduct findings on the basis of her "uncontested subjective belief" that she had a right to a neutral party. Stark cites two

cases in support of her argument that she lacked the intent sufficient for a finding of misconduct on the basis of her belief that she was entitled to a neutral party. *See Milner v. Daniels*, 269 Ark. 762, 600 S.W.2d 429 (Ark. App. 1980); *Carraro v. Dir.*, 54 Ark. App. 210, 924 S.W.2d 819 (1996). Both *Milner* and *Carraro* are distinguishable. Milner's belief as to his conduct was based on his "undisputed understanding of his union's contract with the Company." *Milner*, 269 Ark. at 764, 431 S.W.2d at 431. Carraro's belief as to his conduct was based on his reliance on bad advice from a union representative. *Carraro*, 54 Ark. App. at 215, 924 S.W.2d at 822. Here, Stark's belief was based only on her claim that no one told her she was not entitled to have a neutral party present.

Although Stark contends that the hospital's termination policy gives credence to her belief that she was entitled to a neutral party, there was no evidence to indicate she was aware of such a policy at the time of her discharge. Stark testified that she believed she could have a neutral person because no one told her she could not have one. Giving her the benefit of the doubt, the Board further reasoned that even if Stark initially believed she was entitled to a neutral party, she would not have continued to believe so after being told no one else would be called.

Finally, Stark challenges the intent element of misconduct by arguing that because the hospital did not follow its termination policy and did not point to any policy she violated by her request for a neutral party, the Board lacked substantial evidence to conclude that she willfully disregarded the employer's interest. Citing *Whitmer v. Director*, 2017 Ark. App 367, 525 S.W.3d 45, Stark contends that where an employer fails to follow its written policy in

10

terminating an employee, the employer must prove that it terminated the employee for a "willful disregard of the employer's interest" to establish sufficient intent for misconduct.

Whitmer was discharged for failing to give proper notice of her absence, and the company had no written attendance policy. We stated, "When the employer has no written policy, such as in the case at bar, or fails to follow its written policy, then the facts must be evaluated to determine whether the employee's behavior was a willful disregard of the employer's interest." *Whitmer*, 2017 Ark. App 367, at 4, 525 S.W.3d at 48. Stark's reliance on *Witmer* is misplaced because Stark is substituting the employer's termination policy with a policy or absence of a policy addressing the situation at issue—attendance at the disciplinary meeting.

Stark further argues that when there is no written policy forbidding an action and the employee had not been previously disciplined for taking that action, our court has "made the necessary inference that there is simply no evidence of a *willful* disregard of the employer's interest sufficient for intent." She cites *Sandy v. Director*, 2018 Ark. App. 20, 542 S.W.3d 870, and *Follett, supra.* In *Follett*, we reversed a finding of misconduct for refusal to sign a reprimand where there was no policy against refusing to sign a reprimand, and the employee was never warned that her refusal would result in a disciplinary action. *Follett*, 2017 Ark. App. 505, at 4, 530 S.W.3d at 886. In *Sandy*, we reversed a finding of misconduct where the employee failed to provide a password to an internal auditor and failed to timely process a fuel request. The evidence relied on by the Board in *Sandy* merely showed that two tasks were not completed to the employer's satisfaction. *Sandy*, 2018 Ark. App. 20, at 4,  542 S.W.3d

11

at 872. We concluded that the employer had not presented evidence that the employee intended to disregard his employer's interest where he knew of no policy prohibiting his actions, and he had not been previously disciplined. *Id.* at 5, 542 S.W.3d at 873.

Here, if there were a policy to be reviewed, it would not be the termination policy but would be a policy involving disciplinary meetings. Stark also states that, like *Follett*, there was no policy stating that an employee could not request a neutral party for a disciplinary meeting. Again, Stark was not discharged for requesting a neutral party, it was her refusal to attend the meeting once she was told that no one else would be called. Moreover, as previously discussed, there is substantial evidence to support the Board's conclusion that Stark was given an ultimatum, which did not occur in *Follett*.

Stark's case more closely resembles *Tate v. Director*, 100 Ark. App. 394, 396, 269 S.W.3d 402, 403 (2007), where the employee was fired for insubordination after repeatedly asking the employer to allow her to use her break time to make up for her tardiness after she was told she could not do so but instead had to use her leave time. In affirming the denial of benefits, we stated:

> Asking questions about an employer's policy is not insubordination. Asking the employer to change or interpret the policy is not insubordination. But after the questions are asked and the requested accommodation is rejected, then an employee who refuses to accept the employer's decision about the rules for the workplace is insubordinate.

*Tate*, 100 Ark. App. at 396, 269 S.W.3d at 403.

In the case at bar, the Board found that the employer had an interest in its employees attending disciplinary meetings and a right to expect that Stark would comply with a

12

supervisor's or human-resources manager's reasonable instructions. In light of these findings, the Board found that Stark "intentionally and repeatedly disregarded the employer's interest and expectation when she refused to attend the meeting despite being warned, and she was insubordinate when she failed to comply with reasonable instructions." Considering the evidence before the Board, we hold that substantial evidence supports the Board's finding of misconduct.

In addition to challenging the sufficiency of the evidence to support the Board's decision, Stark appears to raise two public-policy arguments. She asserts that "[b]ecause it would be against public policy to conclude that an employer has an interest in refusing to provide fair discipline during a retaliation investigation, the Board lacked substantial evidence to conclude that [she] willfully disregarded the employer's legitimate interest." The Board did not find that an employer has an interest in refusing to provide fair discipline during a retaliation investigation. Inasmuch as Stark contends that the employer did not have a "legitimate" interest in conducting a disciplinary meeting, this argument is not well taken. Clearly, an employer has a legitimate interest in its employees attending disciplinary meetings.

Citing *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 250, 743 S.W.2d 380, 386 (1988), Stark further asserts that public policy prohibits termination in retaliation for the employee reporting an employer's violation of federal or state law. This present case, however, is not a wrongful-termination case. Moreover, Stark acknowledges that she is not arguing that her termination itself was retaliatory but suggests that it was a termination for her actions taken

in fear of retaliation. Because the issue regarding Stark's belief that she was entitled to a neutral party has already been addressed, we do not address it again. Last, we note that the Board specifically found that there was insufficient evidence showing that the employer was motivated by anything other than the events that occurred on the day of discharge, and Stark makes no argument that the Board improperly considered excluded evidence.

In conclusion, viewing the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings, we hold that substantial evidence supports the Boards's decision and affirm the denial of unemployment benefits.

Affirmed.

VIRDEN and GLADWIN, JJ., agree.

*Abigail Weiss*, Legal Aid of Arkansas, for appellant.

*Dawn R. Kelliher*, for appellee.