Cite as 2026 Ark. App. 81

# ARKANSAS COURT OF APPEALS

## DIVISIONS I & II

**No.** E–25–108

| | |
|---|---|
| MARK MEREDITH<br><br>               APPELLANT<br><br>V.<br><br><br>DIRECTOR, DIVISION OF<br>WORKFORCE SERVICES<br><br>               APPELLEE | **Opinion Delivered** February 11, 2026<br><br>APPEAL FROM THE ARKANSAS<br>BOARD OF REVIEW<br><br>[NO. 2025-BR-00349]<br><br><br>AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

Mark Meredith appeals from the Arkansas Board of Review's (the Board's) decision denying him unemployment benefits because he was discharged from last work for misconduct connected with the work. We affirm.

On March 13, 2025, Meredith applied for unemployment insurance benefits. On the application, he indicated that he worked for a towing company, White Motor Co., Inc. (White Motor), as a dispatcher and that he began working there in August 2000. He noted that he had been discharged and checked the box for "General." Meredith also completed a discharge statement. He stated that the final incident causing his discharge was giving business away to competition, and he explained as follows:

> The so called business that I gave away was an individual had ran out of gas on I-40 close to Forrest City. Bengi Bokker gave me a price of $240 plus tax for White Motor to bring this individual $5 worth of gas, which is totally outrag[e]ous. Of course, the individual denied service. I called the man back after approximately 30 minutes and he was still stranded on I-40, I advised him I had a friend who could

bring him the gas for $75. He was more than happy to accept this offer, Mr. Bokker found out and claimed I was giving their business away and this man may have called back to accept their price, I have worked there for over 20 years and they never call back. Besides, there was no business to start with, when the man refused their service. I had worked for these money hungry individuals and was tired of seeing them screw people who were down and out and stranded on the shoulder of one of the busiest and most dangerous interstates in the country.

On March 21, White Motor submitted an employer statement stating that Meredith had been discharged for "Theft." It also responded that Meredith had been stealing from White Motor and making a profit, which was the first incident that caused Meredith's discharge. It further stated that Meredith had violated its policy prohibiting stealing, and it noted that Meredith had been advised of the policy when hired and several times during his employment. White Motor also stated that Meredith had "given calls away to other people."

On April 28, the Arkansas Division of Workforce Services (the Division) issued a notice of agency determination finding that Meredith was disqualified from receiving benefits because he had been discharged from his last work for misconduct due to dishonesty. The findings of fact state that Meredith "was discharged from their job on 12/13/2024 for unauthorized removal of company property for their own use."

On May 15, Meredith appealed to the Arkansas Appeal Tribunal (the Tribunal) and stated that he challenged the Division's finding that he had stolen from White Motor. He attached a "Warning Report" from White Motor, and it states he was "[g]iving WMC calls away to other people" and "discharged from job."

On June 10, the Tribunal held a hearing. White Motor did not appear. Meredith testified, and he denied stealing from White Motor Company. However, Meredith acknowledged his statement that he had referred an individual, who had called White Motor

2

for fuel delivery, to his friend for the service at a lower price. He explained that White Motor learned that he referred the individual to his friend because the company recorded the dispatch calls. He stated, "The way I look at it, I'm not stealing from them. I'm not taking away business because the business wasn't out there anyway. When the person denied the call or denied that service." He further stated that "there was not that many calls that I did this way, but now I have to pay for it. They didn't accept the call for one thing." Meredith additionally explained that White Motor is owned by the Bokker brothers and that he had to call the Bokker brothers for every call to set a price.

On June 11, the Tribunal affirmed the Division's decision. Meredith appealed the Tribunal's decision to the Board.

On July 24, the Board affirmed the Tribunal's decision. The Board found that Meredith was discharged from last work for misconduct due to a willful disregard of the employer's interest. The Board relied on Meredith's admissions that he referred the potential customer to another individual, and it further found that Meredith's statement that there were "not many calls that I did this way" indicated a pattern of conduct. The Board specifically noted that it "does not find that the claimant engaged in dishonesty." Meredith filed this pro se appeal to this court.

Board decisions are upheld if they are supported by substantial evidence. *Blanton v. Dir.*, 2019 Ark. App. 205, 575 S.W.3d 186. Substantial evidence is such relevant evidence that reasonable minds might accept as adequate to support a conclusion. *Id.* We view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board's findings. *Id.* Even if the evidence could support a different decision, our review

is limited to whether the Board could have reasonably based its decision on the evidence presented. *Id.* Issues of witness credibility and weight to be afforded their testimony are matters for the Board to determine. *Welch v. Dir.*, 2019 Ark. App. 498, 588 S.W.3d 787.

In his petition to this court, Meredith argues that the Board misinterpreted his testimony that there were "not many calls that I did this way." He asserts that he testified that there "weren't many calls that they turned down." He also complains about White Motor's business practices, and he points out that a representative from White Motor did not appear for the Tribunal hearing.

A claimant is disqualified from receiving unemployment benefits if the claimant is discharged from his last work for misconduct in connection with the work. Ark. Code Ann. § 11-10-514(a) (Supp. 2023). It is well settled that we have interpreted misconduct, as that term is used in the statute, to include (1) disregard of the employer's interests, (2) violation of the employer's rules, (3) disregard of the standards of behavior that the employer has a right to expect of his employees, and (4) disregard of the employee's duties and obligations to his employer. *Hernandez v. Dir.*, 2015 Ark. App. 290, 461 S.W.3d 708. We have stated that when the employer has no written policy or fails to follow its written policy, then the facts must be evaluated to determine whether the employee's behavior was a willful disregard of the employer's interest. *Stark v. Dir.*, 2024 Ark. App. 86, 684 S.W.3d 323.

Mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good-faith errors in judgment or discretion do not constitute misconduct. *Follett v. Dir.*, 2017 Ark. App. 505, 530 S.W.3d 884. There must be an intentional or deliberate violation, a

4

willful or wanton disregard, or carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design. *Id.* It is the employer's burden to establish misconduct by a preponderance of the evidence. *Id.* Whether a claimant undertook an act of misconduct sufficient to prevent the receipt of unemployment benefits is a question of fact. *Schock v. Dir.*, 2022 Ark. App. 264, 646 S.W.3d 251.

Viewing the evidence in the light most favorable to the Board, sufficient evidence supports the Board's decision that Meredith disregarded the employer's interest. Meredith called a potential customer on the employer's phone and referred the potential customer to a friend who could perform the same job at a lower price. Meredith appropriated a potential business opportunity from White Motor. Further, as to Meredith's assertion that the Board misinterpreted his testimony concerning the number of times he referred a friend, we defer credibility determinations to the Board as the finder of fact. *Keener v. Dir.*, 2021 Ark. App. 88, 618 S.W.3d 446. Even so, this isolated incident amounts to a willful disregard of White Motor's interest.

Meredith's assertion that White Motor did not appear at the Tribunal hearing is unavailing as Meredith admitted he referred the potential customer to his friend both in his statement and at the hearing. *See Hampton v. Dir.*, 2023 Ark. App. 352, 673 S.W.3d 804 (noting that even though the employer did not offer conflicting evidence, the employee's statement supported the misconduct finding). Additionally, the credibility of witnesses and the weight to be accorded to their testimony are matters to be resolved by the Board. *Id.* As to Meredith's complaints about White Motor's business practices, those complaints are irrelevant to the misconduct finding in the unemployment-benefits context.

5

The dissent characterizes Meredith as a Good Samaritan and suggests that there is no evidence he acted against the employer's interest. However, Good Samaritans do not provide services for a profit. How does Meredith's referring a potential customer elsewhere for the same service at a lower price salvage goodwill for the employer? The dissent ignores the above-cited case law and views the evidence in the light most favorable to the claimant, which we cannot do on appeal.

In response to the dissent, we assure our esteemed colleague that we are indeed sympathetic to Meredith and have no lack of empathy for his efforts to help the stranded traveler. However, we are not a court of moral justice, and it is, unfortunately, not our function to right the wrongs of an imperfect world. There is a much higher court for those purposes.

The dissent additionally complains about the employer's failure to appear for the hearing to present evidence of its policy or interest. However, the Board did not find misconduct based on a violation of the employer's policy. We have stated that when the employer has no written policy, then the facts must be evaluated to determine whether the employee's behavior was a willful disregard of the employer's interest. *Hernandez*, 2015 Ark. App. 290, 461 S.W.3d 708. That's precisely what the Board did in this case, and the evidence supports the Board's finding.

Moreover, the evidence is not in dispute. As stated earlier, Meredith admitted to the conduct both in his statement and at the hearing. *See Hampton v. Dir.*, 2023 Ark. App. 352, 673 S.W.3d 804 (noting that even though the employer did not offer conflicting evidence, the employee's statement supported the misconduct finding). Simply put, underbidding

your employer for its services is clearly a disregard of the standard of behavior that the employer has a right to expect from its employees.

Judge Harrison references the recent decision in *Boyce v. Director*, 2025 Ark. 601. In *Boyce*, this court reversed the Board's denial of benefits and remanded for an award of benefits because the employer, who contended the employee resigned, did not appear for the hearing, and the employee denied resigning from her job. *Boyce* is inapplicable here. In this case, the critical evidence is not disputed. Although we would probably agree that the employer here engaged in egregious price gouging (or attempted to anyway), that is an issue for another forum and is not the focal point of this case.

Affirmed.

TUCKER, WOOD, HIXSON, and MURPHY, JJ., agree.

HARRISON, J., dissents.

**BRANDON J. HARRISON, Judge, dissenting**. <u>Note to Self</u>: File this case in the "no good deed goes unpunished" folder. Not even when the punisher (employer) does not appear at a hearing to provide any testimony or documentary evidence why the Good Samaritan (Mark) violated an established employer interest in a kind or degree that warrants a denial of benefits. Because I am increasingly concerned with seeing both the Agency and this court presume, speculate, and otherwise inject their own notions of misconduct—although no employer has provided a stated policy or clear interest that was willfully violated in the circumstances—I respectfully disagree with the majority's platitude-laden, unsupported affirmance.

It's enough to know that, after Mark quoted a traveler stranded on the side of the road a $240-ish price to supply the person some gas, and after the traveler rejected the quote (2x no less), employee Mark told the stranded person he knew "a guy" who might be able to help for $75. Somehow this came out, and the employer fired Mark, who was then denied benefits, although there was no proof of any policy statement (oral or written) that forbade what he did *in the circumstances presented*. In fact, the actual record shows the employer was flailing about, trying to find some justification to contest benefits. Not even the Appeal Tribunal noticed it. The Board of Review purported to clean up that mess; but it did only slightly better, and not good enough in any event to survive a meaningful review.

Just like the Agency, the majority affirms a denial of benefits although it hasn't named one policy statement in the record or provided one quote from the employer (who never showed under oath) that prohibited Mark's effort to help another human being *in the circumstances presented*. (Ever run out of gas on the side of the road? Zeus forbid that A show B some empathy in the moment!)

There is no proof that the employer lost money. None. Again, the employer did not gain the stranded stranger's business because it was, in the traveler's mind, trying to gig the man. The stranded traveler said no to the employer's service, which Mark offered not once, but twice. That clear rejection is of material importance. What did Mark get for his Good Samaritan-type offer? A firing. Okay, nothing to do about that. But then came a denial of benefits without any proof that there was a policy in place—heck, even some understanding—that helping a NON-CUSTOMER out in that moment and in that way was a violation of the employer's interest. I see it exactly the opposite way, which is

8

reasonable. If I were stranded, I would think a little better of an employer if it had an employee that showed some empathy and went out of his way to help me, a stranded bloke on the side of the road. To me, Mark helped salvage some goodwill, not destroy it. Our court forfeits a morsel of its goodwill today, and that's too bad.

We do not supply or define an "employer's interest." The Agency does not have the right to do that either. Only an employer can state its interests and decide when an employee action violates a stated interest in a manner that it believes precludes benefits under the law. We don't have that. Here, we just recycle the usual platitudes that effectively handwave away the lack of proof with familiar and comfortable-sounding phrases. We get what we permit, and we have increasingly permitted too much speculation and not enough evidence in these cases.

★ ★ ★

I would demand more from the Agency, employers, and ourselves. We have eroded any semblance of an evidentiary burden in too many cases. *Boyce v. Dir.*, 2025 Ark. App. 601, at 5 ("No-shows get no extra credit."). Given the lack of proof of a stated employer interest covering the circumstances, I would reverse the denial and remand for benefits.

*Mark H. Meredith*, pro se appellant.

*Cynthia L. Uhrynowycz*, for appellee.